**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MARCUS MONCHERY,**

Plaintiff,

v. Civil Action No. **3:24CV676 (RCY)**

**L. CHUMNEY, *et al.*,**

Defendants.

## MEMORANDUM OPINION

Marcus Monchery, a former Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action in which he alleges that he was denied adequate medical care in violation of the Eighth Amendment during his confinement in the Baskerville Correctional Center. The matter is presently before the Court on the Motion for Summary Judgment filed by the last remaining Defendant, Dr Gamez. For the reasons set forth below, the Motion for Summary Judgment will be GRANTED.

## I. RELEVANT PROCEDURAL HISTORY

The action proceeds on Monchery's Particularized Complaint (hereinafter simply, "Complaint"). ECF No. 20. Three of the four Defendants named in the Complaint have been dismissed,[1] leaving only Dr. Gamez. Monchery raises the following claim against Dr. Gamez, under the header, COUNT 2:

> Dr. Gamez acted with deliberate indifference to [Monchery's] serious medical need by
>
> [a] failing to order an MRI . . . despite [Monchery]'s persistent complaints and the medical indications for such a diagnostic test;

[1] By Memorandum Order entered on November 17, 2025, the Court dismissed Defendants RN L. Chumney and M.S.C. Health Services Director/Level 2 Respondent as parties to the action, because Monchery failed to serve them in a timely manner. ECF No. 40. On August 20, 2026, the Court granted Defendant R. Whitt's Motion to Dismiss and dismissed Whitt from the action. ECF Nos. 55, 56.

> [b] Adhering to a protocol that delayed or denied necessary . . . imaging . . . ; [and]
> [c] Permitting [Monchery]'s condition to worsen without adequate diagnosis or treatment.

Compl. 6–7.[2] Based on this alleged Eighth Amendment violation, Monchery demands monetary damages and injunctive relief in the form of revoking Dr. Gamez's medical license. *Id.* at 10.

On November 25, 2025, Dr. Gamez filed the instant Motion for Summary Judgment, ECF No. 42. The Court provided Plaintiff with notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), *see* ECF No. 44, and Monchery filed a response and a supplement thereto. ECF Nos. 45, 47. Dr. Gamez did not file a reply, and the time to do so has passed. Monchery recently filed a Motion for Leave to Supplement the Record, ECF No. 51, to add a copy of his MRI results. That request will be GRANTED and the MRI Report will be accepted as part of the record.

Based on the foregoing, the Motion for Summary Judgment is ripe for review.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the

[2] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the capitalization, punctuation, and spelling in the quotations from Monchery's submissions.

motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of his Motion for Summary Judgment, Defendant Gamez submits his own Affidavit, which is based on his personal knowledge and his review of Monchery's medical records. Gamez Aff., ECF No. 43-1.

At this stage, the Court is tasked with assessing whether Monchery "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits

or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. In response to the Motion for Summary Judgment, Monchery simply filed two unsworn briefs that fail to comply with Local Rule 56(B).[3] Monchery failed to respond to the Motion for Summary Judgment with any evidence.[4] Monchery also submitted an unsworn Complaint.[5] Monchery's failure to present any evidence to counter Dr. Gamez's Motion for Summary Judgment permits the Court to rely solely on Dr. Gamez's submissions in deciding the Motion for Summary Judgment. *See Forsyth*, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The Court need only consider the cited materials . . . .").

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment. All permissible inferences are drawn in favor of Monchery.

---

[3] In order to ensure that the parties shoulder their respective burdens for a motion for summary judgment, Local Rule 56(B) requires that:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a *specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated* and *citing the parts of the record relied on to support the facts alleged to be in dispute*. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added). Monchery's Response has neither a section listing the genuine issues of material fact nor citations to the record relied on to support the facts alleged to be in dispute.

[4] Monchery submitted a few medical records, *see* ECF No. 45-1; ECF No. 51-1; however, he never cites to them in his Response. Moreover, "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (citation omitted). "For documents to be considered, they 'must be authenticated by and attached to an affidavit' that meets the strictures of Rule 56." *Campbell v. Verizon Va., Inc.*, 812 F. Supp. 2d 748, 750 (E.D. Va. 2011) (quoting *Orsi*, 999 F.2d at 92). Although the Court is not required to consider such unsworn and authenticated medical records on summary judgment, the Court has nevertheless reviewed them and find they fail to alter the Court's conclusion that Dr. Gamez was not deliberately indifferent to Monchery's knee pain.

[5] The Court notes that even though it is not evidence, Monchery's recitation of the alleged facts underlying his claims is generally consistent with the medical record put forth by Dr. Gamez.

## III. SUMMARY OF UNDISPUTED FACTS

As a preliminary matter, the Court notes that the medical record is quite lengthy and is generally not contested by Monchery. Rather, at the base of his claim, Monchery simply disagreed with Dr. Gamez's determination that an MRI was not warranted at that time. However, Monchery received a great deal of medical care for his chronic knee pain during the four-month period he was housed in Baskerville Correctional Center ("Baskerville"). Despite Monchery's apparent dissatisfaction with the prescribed treatment, the record reflects that Monchery clearly received constitutionally adequate medical care for his knee pain.

### A. Monchery's Medical History at Baskerville

Dr. Gamez began working as a physician at Baskerville an institution within the Virginia Department of Corrections ("VDOC") in 2023. Gamez Aff. ¶¶ 1, 9. Monchery was transferred to Baskerville on December 6, 2023. *Id.* ¶ 10. On December 11, 2023, Monchery saw a nurse for his complaints of a left knee injury that began in 2022. *Id.* ¶ 11. Monchery indicated to the nurse that he "prefers the natural remedy" and he declined pain medication. *Id.* The nurse educated Monchery on the use of ice and heat to provide pain relief. *Id.* The nurse noted no swelling in his left knee, no deformity, and noted that Monchery's gait was steady. *Id.*

On December 13, 2023, a mere two days later, Monchery saw a nurse practitioner ("NP") for his complaints of left knee pain. *Id.* ¶ 12. The NP examined Monchery, and Monchery explained to the NP that he had previously had an x-ray of his knee but that he wanted an MRI. *Id.* Specifically, Monchery told the NP that he wanted an MRI or else he was going to file a lawsuit. *Id.* Monchery also requested to have his iron levels tested because he was cold, and "his mother used to feel cold when she had low iron levels." *Id.* The NP documented a positive

McMurray test[6] and noted a pocket of swelling on the lateral side of Monchery's patella. *Id.* The NP ordered a complete blood count, a complete metabolic panel, and testing of Monchery's iron and ferritin levels to check for iron deficiency anemia. *Id.* The NP also ordered x-rays of Monchery's left knee with multiple views. *Id.*

Monchery had his left knee x-rayed on December 19, 2023. *Id.* ¶ 14. The medical department drew Monchery's blood on December 20, 2023, and the results came back on December 21, 2023. *Id.* ¶ 13.

On December 27, 2023, Monchery had an appointment with a nurse during which he complained about left shoulder pain. *Id.* ¶ 15. Monchery reported that he had been stabbed in 2010 or 2011 in his left arm. *Id.* The nurse documented Monchery's complaints, noted that he was already on the list to see the doctor, and provided him with Motrin for pain. *Id.* The following day, December 28, 2023, Dr. Gamez first saw Monchery for his complaints of left knee pain. *Id.* ¶ 16. Monchery also complained of left shoulder pain. *Id.* Upon examining Monchery, Dr. Gamez noted as follows: "[M]ild left painful range of motion, neurovascularly intact distally, stable in all planes, mild effusion (left knee). Left elbow WNL [within normal limits], neuro-vascularly intact. Exam otherwise normal." *Id.* (second alteration in original). Dr. Gamez did not recommend or prescribe fish oil to Monchery at this appointment. *Id.*

On January 5, 2024, Monchery had an appointment with a nurse. *Id.* ¶ 17. At this appointment, he asked when he was going to receive fish oil. *Id.* Monchery told the nurse that at his appointment on December 28, 2023, where he reported having left knee and left elbow pain,

[6] The parties do not offer any explanation of what a McMurray test entails. Apparently, a McMurray test "is a series of knee and leg movements healthcare providers use to diagnose a torn meniscus." *See* https://my.clevelandclinic.org/health/diagnostics/23442-mcmurray-test (last visited May 19, 2026). However, "[s]ome studies have shown that the McMurray test may not be very accurate at proving whether or not [a] meniscus is torn." *Id.*

that Dr. Gamez ordered fish oil for him, which was not true. *Id.* The nurse noted that there was nothing in his medical record about fish oil. *Id.* Monchery told the nurse, "it was for arthritis." *Id.* The nurse reported that Monchery was very upset that he did not receive fish oil. *Id.* The nurse referred the issue to Dr. Gamez to review. *Id.*

Dr. Gamez avers that

> [f]ish oil is not medically approved for the treatment of pain. It is not classified as a drug and instead is classified a food product. While some studies report that there may be some health benefits to taking fish oil, it is not typically prescribed or ordered for pain. Specifically as to Monchery, it is not medically recognized or indicated for knee pain. I do understand that some people report that it helps relieve their symptoms, and fish oil is available for purchase from VDOC's commissary if an inmate patient believes he should take fish oil.

*Id.* ¶ 18.

On January 11 or 12, 2024, Dr. Gamez reviewed Monchery's x-rays of his knee. *Id.* ¶ 19. Dr. Gamez noted that his x-rays were within normal limits and were clinically insignificant. *Id.*

On January 15, 2024, Monchery saw a licensed practical nurse ("LPN") and complained about arthritis in his knee. *Id.* ¶ 20. Monchery reported to the LPN that he was "supposed to be set up on MRI per NP." *Id.* Monchery reported to the LPN that Tylenol and Ibuprofen were not working and "he needed something." *Id.* Monchery informed the LPN that he believed he has a torn meniscus. *Id.* Monchery refused the offer of Tylenol or Ibuprofen for pain, and the nurse referred him to Dr. Gamez. *Id.*

On January 17, 2024, Dr. Gamez saw Monchery, who reported knee pain, and requested an MRI and fish oil. *Id.* ¶ 21. Monchery stated that he could not afford to buy fish oil from the commissary, but he admitted that he had spent money on other food products from the commissary. *Id.* Monchery had previously been provided with a knee brace, but he reported he did not want it, and he also was not taking the prescribed Tylenol or Ibuprofen. *Id.* Monchery informed Dr.

Gamez that he performed lunges and squats as exercise. *Id.* Dr. Gamez explained to Monchery that the x-ray of his left knee was unremarkable. *Id.* Dr. Gamez then examined Monchery's knee and found that it was not tender, there was no swelling, and it was stable. *Id.* Dr. Gamez also noted that the blood flow and nerve function in the left knee was good. *Id.* Dr. Gamez advised Monchery that based on the physical examination of Monchery's knee, the x-ray results, and Monchery's high level of function, that an MRI was not indicated at that time. *Id.* Dr. Gamez also specifically advised Monchery not to do lunges or squats because that type of exercise could stress the knee and exacerbate knee pain no matter the underlying source of pain. *Id.*

On February 12, 2024, Monchery was seen by a nurse and again complained that he wanted an MRI. *Id.* ¶ 22. The nurse noted that Monchery had been seen by the doctor on several occasions and that the doctor determined that an MRI was not medically necessary. *Id.* The nurse noted that Monchery was agitated during the appointment, did not like what he heard, and threatened to sue his medical providers. *Id.*

On March 15, 2024, Dr. Gamez saw Monchery for his complaints of left arm and hand pain and numbness. *Id.* ¶ 23. Upon examination, Monchery's left arm was unremarkable and his blood flow and nerve function were normal. *Id.* Dr. Gamez referred Monchery for physical therapy and imaging, and approved orthotic shoe insoles. *Id.*[7] That same day, Dr. Gamez submitted a request for a physical therapy consultation for Monchery's left knee pain and left arm complaints. *Id.* ¶ 24. The request was approved on March 17, 2024, and the request for the consultation was then sent for scheduling by the medical department scheduler. *Id.*

---

[7] Dr. Gamez avers that he cannot remember the specific reason he ordered insoles for Monchery, but that it was common for inmates to see other inmates with insoles and then to request their own pair for comfort. Gamez Aff. ¶ 23. In response to Monchery's allegation that he received insoles for a bone spur, Dr. Gamez has no documentation from this appointment that he diagnosed Monchery with a bone spur or that he reviewed an x-ray showing that Monchery had a bone spur. *Id.*

On April 15, 2024, Monchery was seen by a nurse for his complaints of left arm pain with intermittent numbness that he had experienced for around three weeks. *Id.* ¶ 25. Monchery indicated that he saw the nurse at sick call three days earlier, and that the muscle rub she provided him was not working. *Id.* Monchery again insisted that he wanted fish oil and stated that fish oil was "the only thing that would help his pain." *Id.* The nurse reported that Monchery was "very agitated" at the appointment and that he wanted fish oil right away for the pain in his shoulder and arm. *Id.* The nurse noted that Monchery was belligerent and was not open to any other pain management. *Id.* Monchery was told that he would have an appointment with the doctor but was then informed that due to his behavior he would have to leave the sick call appointment. *Id.*

That same day, Monchery had an off-site appointment for physical therapy with InMotion PT. *Id.* ¶ 26. On April 29, 2024, Monchery had another appointment with InMotion PT and upon his return to Baskerville, he had no concerns or complaints about his physical therapy appointment. *Id.* ¶ 27. Following the completion of his sessions, InMotion PT recommended an additional four weeks of physical therapy. *Id.* ¶ 28. On May 3, 2024, Dr. Gamez completed a second request for a consultation for physical therapy for Monchery's left knee and left arm, and the request was approved the same day. *Id.* ¶ 28.

On May 8, 2024, Monchery was transferred to Green Rock Correctional Center ("Green Rock"). *Id.* ¶ 29. The medical transfer paperwork noted that Monchery's ongoing medical concerns included, "L knee arthritis / torn meniscus / pending PT." *Id.* ¶ 29. Once Monchery was transferred to Green Rock, Dr. Gamez no longer provided care for Monchery. *Id.* ¶ 30. Dr. Gamez notes that once Monchery arrived at Green Rock, he saw a medical provider and reported his knee pain, requested an MRI, and fish oil. *Id.* ¶ 31. The medical records reflect that on May 29, 2024, the provider refused to order an MRI or provide Monchery with fish oil. *Id.*

Dr. Gamez explains that he "understand[s] that Monchery complains to the Court that he developed a bone spur in his foot because—in his opinion—he was not provided an MRI." *Id.* ¶ 32. Dr. Gamez avers that bone spurs do not develop from failing to receive an MRI or treatment for a torn meniscus. *Id.* Instead, bone spurs can develop for many reasons, but not simply "because of the treatment modalities for one's knee pain." *Id.*

**B. Appropriate Treatment for Knee Pain**

Dr. Gamez explains that when a patient presents with complaints of knee pain, providers engage in a process known as differential diagnosis because the root cause is often not known. *Id.* ¶ 33. Providers use diagnostic tools to formulate treatment, which generally begins with conservative and less invasive options and then can progress to more aggressive and invasive treatment. *Id.* Dr. Gamez explains that while Monchery asserts that he had a torn meniscus, Dr. Gamez never diagnosed Monchery with a torn meniscus and even if Monchery had a torn meniscus, Dr. Gamez would have prescribed the same course of treatment. *Id.* ¶ 36. The first line of treatment and diagnosis for a torn meniscus is rest, ice and or heat, over-the-counter anti-inflammatory medications, and physical therapy. *Id.* ¶ 37. Dr. Gamez explains that "[i]t would be highly unusual . . . for a patient complaining of knee pain similar to that of Monchery's complaints to be ordered an MRI without first trying more conservative and less invasive diagnostics." *Id.* Dr. Gamez avers that while an MRI might have been appropriate if the conservative treatments did not work, "Monchery's symptoms and presentation during [his] examinations did not warrant an MRI during any of [his] visits." *Id.*

Dr. Gamez also notes that despite his complaints of knee pain, Monchery was able to perform exercises, such as lunges and squats, that can be very stressful to a knee and may have caused the pain on their own or exacerbated his pain. *Id.* ¶ 38. Although he sometimes reported

knee pain, Monchery had no difficulty walking, his gait was normal, his range of motion was generally normal, his blood flow and nerve function were normal, and he could engage in normal activities. *Id.* ¶ 38. Dr. Gamez explained that "[m]ost of [his] examinations found [Monchery] to have no findings that would substantiate a clinically significant injury, especially given Monchery's own reports of his physical activity." *Id.* Dr. Gamez once again avers that Monchery's "presentation and circumstances did not warrant an order for an MRI." *Id.*

## IV. ANALYSIS

### A. Eighth Amendment Principles

To survive summary judgment on an Eighth Amendment claim, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and

> disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which

may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Moreover, "[i]t may not be seriously contended that any prisoner detained for however short a period is entitled to have all his needed elective medical care performed while in custody . . . ." *Kersh v. Bounds*, 501 F.2d 585, 589 (4th Cir. 1974).

**B. Count 2[a]**

In Claim 2[a], Monchery contends that Dr. Gamez "acted with deliberate indifference to [Monchery's] serious medical need by:" (a) failing to order an MRI despite Monchery's "persistent complaints and the medical indications for such a diagnostic test." Compl. 6. This claim is a non-starter. Although Monchery desired an MRI of his knee during the four months he was housed in Baskerville, "[t]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray [or MRI], or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107; *see Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" (citing *Estelle*, 429 U.S. at 107)). Moreover, as explained below, Monchery clearly disagrees with the timing and course of care he received, both of which fail to state a claim of deliberate indifference. Count 2[a] lacks merit and will be DISMISSED.

**C. Count 2[b] and [c]**

In Claim Two[b] and [c], Monchery contends that Dr. Gamez "acted with deliberate indifference to [Monchery's] serious medical need by:" (b) following "a protocol that delayed or denied necessary" imaging; and, (c) "[p]ermitting [Monchery's] condition to worsen without adequate diagnosis or treatment." Compl. 6–7. First, it is unclear whether Monchery's knee pain amounted to a serious medical need. Dr. Gamez never diagnosed Monchery as having a torn

meniscus during the four months he treated Monchery. The Court is left with Monchery's own diagnosis that he had a torn mensicus.[8] However, Monchery is not a medical professional and is not competent to provide a medical opinion about his knee pain, nor are his personal views of any evidentiary value. Fed. R. Civ. P. 56(c)(4); *see Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (holding that prisoner "[w]holly lacking in medical knowledge" may not give expert medical testimony). Moreover, Monchery could do exercises such as squats and lunges, had no problems with walking or his gait, his range of motion was normal, and he could engage in normal activities. Thus, it is unclear whether Monchery's knee pain was a serious medical need at the time Dr. Gamez treated him.

Nevertheless, even assuming that Monchery's knee pain was sufficiently serious, the record makes clear that Dr. Gamez did not act with indifference to Monchery's complaints of pain. Instead, Dr. Gamez first attempted to diagnose Monchery's knee pain with an x-ray to see if there were any broken bones, which there were not, and then also prescribed a course of treatment with heat, ice, pain medication, and a knee brace. Monchery was unwilling to follow this course of treatment, which is not the fault of Dr. Gamez. Monchery also insisted on engaging in exercises that were detrimental for a person with knee pain, and the Court may draw a reasonable inference that these exercises may have exacerbated any pain or injury. When Monchery continued to complain of pain in his knee and also in his shoulder, Dr. Gamez referred Monchery to physical

---

[8] Monchery points to his transfer paperwork that noted that Monchery's ongoing medical concerns included, "L knee arthritis / torn meniscus / pending PT," Gamez Aff. ¶ 29, as evidence that he had a torn meniscus. Pl.'s Br. Opp'n Mot. Summ. J. ("Pl.'s Opp'n") 3, ECF No. 45. However, Dr. Gamez avers that he never diagnosed Monchery with a torn meniscus. Gamez Aff. ¶ 36. Although Monchery fails to cite to the records he attached to his Response, the Court notes that Monchery submitted medical records showing that he had an MRI of his knee on April 25, 2025, Pl.'s Opp'n Ex. 1 at 9, ECF No. 45-1, may have had arthroscopic surgery, *id.* at 8, and had another MRI on March 21, 2026, *see* ECF No. 51-1. Neither the Court nor Monchery are medical experts that could read the results of an MRI. Moreover, the MRIs occurred a year and two years (respectively) after Dr. Gamez provided Monchery with medical care.

therapy. Moncherry had not finished his course of physical therapy when he was transferred to a new facility.

The record shows that Dr. Gamez did not disregard an excessive risk to Monchery's health or safety necessary to show a constitutional violation. It appears that, at most, Monchery disagreed with the treatment plan prescribed by Dr. Gamez and he simply wanted an immediate MRI. However, Monchery was not entitled to the medical care of his choosing. *Wright*, 766 F.2d at 849 (citations omitted); *Bowring*, 551 F.2d at 48 ("disavow[ing] any attempt [of the Court] to second-guess the propriety or adequacy of a particular course of treatment"); *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (explaining that "[i]t is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment"). Monchery complains of nothing more than a disagreement with Dr. Gamez's professional medical opinion about the appropriate course of treatment and its timing, and thus, he fails to establish a cognizable constitutional claim, much less deliberate indifference.[9]

Monchery also seemingly suggests that by refusing to order an MRI, Dr. Gamez delayed treatment for his knee pain. The record reflects that this is not true. Where an inmate's inadequate medical care claim is predicated upon a delay in care, the inmate must also establish that the delay in the provision of medical care "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)) (identifying this additional requirement of the objective prong); *see Webb v. Hamidullah*, 281 F. App'x 159, 166–67 n.13 (4th

[9] Monchery argues that a positive McMurray test means that he had a torn meniscus and Dr. Gamez ignored those results. Pl's Opp'n 1. Once again, Monchery is not competent to provide a medical opinion. Nevertheless, even if the test showed that Monchery had a torn meniscus, Dr. Gamez explains that this would not have changed his course of treatment and that the symptoms with which Monchery presented did not warrant an MRI at that time.

Cir. 2008) (citing cases for "substantial harm" requirement). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citations omitted); *see Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting *Monmouth Cnty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

At most, Monchery suggests that the delay in his receipt of an MRI caused him to develop a bone spur in his foot, "hip issues, and severe mental and emotional distress." Compl. 7; *see* ECF No. 47, at 2. This is nothing more than speculation and conjecture. Again, Monchery is not a medical professional and is not competent to provide a medical opinion about how his bone spur developed or that his knee pain caused vague "hip issues," nor are his personal views of any evidentiary value. *See Pearson*, 237 F.3d at 886. Dr. Gamez avers that a bone spur in a foot is completely unrelated to knee pain or a knee injury and could not be caused by any lack of treatment for a knee injury. Monchery fails to demonstrate how the lack of an MRI caused him hip issues or severe emotional distress, especially when he was receiving treatment and physical therapy for his knee. Monchery fails to show that the delay in his receipt of an MRI standing alone caused him substantial harm.

In the end, Monchery puts forth no evidence from which a jury could reasonably find that Dr. Gamez's exercise of medical judgment was "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851. Accordingly, Count 2[b] and [c] lack merit and will be DISMISSED.

## V. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Leave to Supplement the Record (ECF No. 51) will be GRANTED. Defendant Dr. Gamez's Motion for Summary Judgment (ECF No. 42) will be GRANTED. Count 2 will be DISMISSED. And, the final remaining claim in this suit having been so disposed of, the action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

/s/ RCY
Roderick C. Young
United States District Judge

Date: August 21, 2026
Richmond, Virginia